CAYUGA COUNTY.—HON. JOHN D. TELLER, SURRO-
GATE.—December, 1888.

MATTER OF SOULE.

*In the matter of the application for the revocation of
probate of the will of* LYMAN SOULE, *deceased.*

Testator died at about the age of ninety-two years, leaving a will and four
codicils thereto, executed at various times from about five years to six
months before his death.  Testator was unmarried and the beneficiaries
of his will in varying amounts, were all his relatives, clergymen, his
intimate friends, his attorney, and several charitable institutions.
About the time of the execution of the will and codicils, testator had
attacks of dizziness, during some of which he lost consciousness en-
tirely, in one instance for about the space of twenty minutes; he was
forgetful, lost his way in the streets, and asked questions as to places
with which he had once been perfectly familiar; he complained of in-
ability to attend to his business, and, from time to time, failed to
recognize old acquaintances.  But it was shown that when he was
informed of the names of persons and places which he had forgotten,
he appreciated the information given and acted in accordance with
it, and his conduct and remarks were rational.  It was shown clearly
also by those who were well acquainted with him, among others by the
cashier and teller of the bank where he kept his papers and almost
every day spent a portion of his time, that he was accurate and intelli-
gent in his business affairs, and gave good reasons for his actions in
relation thereto.  Although in many details, the distribution of his
property was altered by the codicils, the general scheme in its outlines
remained the same and coincided with his declarations as to what he
intended to put, and what he had put, into his will and codicils.  *Held,*
that the testator had testamentary capacity, and that even if his condi-
tion could be called one of mental alienation, that such condition was
not continuous, and failed to establish the existence of *senile dementia.*
Where a man at the time of the execution of his will is of unusually ad-
vanced age, and, consequently, of weakened powers, to admit his will
to probate it is necessary to decide that he fully understood the nature
and consequences of his testamentary act, and this must be determined
from evidence other than that of the formal execution of the will.
The fact that a will is illegal in some of its provisions can be no evidence to
show that the attempted disposition was not understood, unless the
testator was a lawyer, and well acquainted with the law.

.MATTER OF SOULE.

A will should be viewed from the testator's standpoint rather than from that of the scrivener who drew it, and if it appears that the will as dictated by the testator was comprehended by him, and that his ideas have been accurately expressed in the will, although in language more obscure than is ordinarily used, and not readily understood by a stranger, it must be held that the will in this respect complies with the law, although for some other reason it may not do so.

Where, upon the whole evidence, the conclusion is imperative that the testator, at the time of the execution of his will, is able to understand the condition of his property, his obligations to those who are related to him by ties of blood, or who have legal or moral claims upon him, and the character and effect of the provisions of his will, although it may appear that his perceptive powers and memory are somewhat impaired, as would naturally be supposed in one of his advanced years, that his regulative faculties and business acumen are shown to have been remarkably well preserved; in such case, the testator has testamentary capacity.

Where a weak-minded person makes a will in favor of his confidential adviser, to the exclusion of the natural objects of his bounty, the law presumes undue influence, and, in order to sustain the will, there should be some proof besides the making of it. This presumption, however, is one of fact, and where the evidence tends to show that the will was the voluntary, deliberate act of a person of ordinary intelligence prompted by affection, without improper persuasion, and the will is not unjust, a decree admitting it to probate will be upheld.

The court will jealously examine the evidence and be judicially satisfied that the paper expresses the true will of the testator, in the case of a will in favor of the person who drew it, but proof of the fact that the testator had full testamentary capacity and knew the contents of the will is sufficient to remove such suspicions, and place the burden upon the contestants of proving undue influence.

A legatee who accepts a legacy under a decree entered admitting a will to probate is thereby estopped from contesting the validity of the will.

A tender of the amount of such legacy with interest, but without costs, into court after the filing of a petition to set aside the probate had been commenced, does not remove the estoppel of the legatee.

*It seems*, that even a tender of the full amount of the legacy, interest, and costs at such time would not have the effect of removing an estoppel.

Upon a proceeding for revocation of the probate of a will the whole case is left open and the contestant has the right to have litigated, tried, and determined, upon the same, or upon additional, evidence, the very questions which were litigated when the will was first proposed for probate.

Upon application for the revocation of probate of a will the legality of a direction as to the accumulation of interest cannot be considered, the only inquiry being whether the will was legally executed, and if it shall stand as proven, or if probate should be revoked and the will set aside.

The construction of a will and the decision as to the legality of particular provisions must be had either upon the judicial settlement of the accounts of executors, or in a proceeding or action brought for that purpose.

APPLICATION for the revocation of the probate of the will of Lyman Soule.

The facts fully appear in the opinion.

M. M. WATERS, *for petitioner*.

H. V. HOWLAND *and* M. A. KNAPP, *for executors and others*.

HAROLD E. HILLS *and* WOOLSEY R. HOPKINS, *special guardians*.

THE SURROGATE.—This is an appeal upon the part of Mrs. Cynthia D. Rood, the petitioner, with George S. Everts, for a revocation of the probate of the will and codicils, four in number, of Lyman Soule, deceased, which were admitted to probate in this court, by decree, dated June 26, 1886. The proceeding for probate was instituted by the filing of a petition therefor, on the part of Charles G. Briggs, Esq., one of the persons named as executors in the third codicil to said will, on the 16th day of December, 1885, and the issuing of citations upon that day. Thereafter one Leroy Soule, an heir at law and next of kin of said decedent, appeared in said proceeding by his attorney and counsel, and filed objections to the said probate. Eighteen other heirs at law and next of kin appeared by the same attorney. The petitioner in this proceeding was among the number so appearing. The issues thus joined were tried in part, evidence was given by all the subscribing witnesses to the will and codicils. The petitioners had rested their case, some evidence

had been adduced upon the part of the contestants, when a compromise was agreed upon, and the opposition to probate withdrawn, the residuary legatees, Howard Soule, Fanny J. Green, Mary S. Paige and Charles F. Durston stipulating that the moneys bequeathed to them by the first subdivision of the thirty-first article of the third codicil should not be counted or created as among the legacies, which by the third division of said article, are made the basis of the distribution of the residuary estate. To carry this agreement into full effect, the decree, at the request of all the parties through their attorneys, was made to embody a construction of the will, in conformity with the stipulation. The answer interposed by Leroy Soule, and by which issue was raised, attacked the validity of the attempted disposition of the property by the thirty-fifth and thirty-seventh items of the will; the fourth item of the codicil of March 25, 1882; and the thirty-first item of the codicil of March 7, 1884; and questioned the legal effect of the last two paragraphs thereof, which are referred to in the stipulation and decree. The answer also alleges that the will and codicils were not the free or voluntary acts of the testator, but were procured by fraud and undue influence, and that the testator at the times of their execution, was not of sound mind, all of which was decided contrary to the allegations of the answer, except that the will was construed in accordance with the stipulation.

The petition for revocation of probate alleges that Lyman Soule, at the time of making the writings, purporting to be his last will and testament and codi-

cils, was not of sound mind or memory, or in any respects capable of making a will; that he did not know their contents; that they were not witnessed at his request; that they were procured by fraud and undue influence; and that, after the execution, the papers were altered, and other papers substituted in their place. Upon the last claim, no direct proof was given. The third codicil to the will, bearing date March 7, 1884, is shown to be in the handwriting of Charles F. Durston, who is named therein as one of four parties to share equally in the income of the residue of the estate, for the period of five years, and at the end of that time, to have each one fourth of $100,000. He is also named as an executor. The dispute over the testamentary capacity of the testator, and the burden of showing that the codicil, so written by an interested party, was the free and untrammeled expression of the testator's wishes, have been the chief sources of difficulty in the case.

The will and two of the codicils are quite long, and at first some of the provisions seem intricate.

At the time of the execution of the third codicil, the decedent was about ninety-one years of age. He had never been married, and his nearest relatives were nephews and nieces, and their descendants, who are quite numerous, and all recipients, by the will and codicils, of his bounty. The length of the instruments is due principally, to the large number of bequests, and the repetition of formal words. By the first clause of the will, payment of debts and funeral expenses is provided for. In the second clause, is contained a devise of three farms to a brother (since

deceased), and his descendants. The third contains a devise of the use of a farm for life to two nieces. The next thirty clauses of the will contain general money legacies to relatives and friends, including two lawyers, who had rendered services to the testator, and one of them drew the will. The thirty-fourth clause contains gifts of $5,000 each to three charitable institutions in the city of Auburn. In the thirty-fifth clause, the sum of $2,000 is set apart to provide means of caring for the testator's family cemetery lots and surroundings, and, in the thirty-sixth clause, the same amount is appropriated to the purchase of a monument. By the thirty-seventh clause, the residue and remainder of the estate is given to the executors in trust, to invest the proceeds and pay the interest to nine relatives, who are named, in such proportions as the executors deem proper, during the period of ten years, and, at the expiration of that time, to divide the principal among the heirs at law of such persons in such manner, as the executors may deem proper, in view of their condition, wants and circumstances, it being provided that if any of such persons die within the ten years, the share going to the heirs of that person may be paid at once. By the next clause, the general legacies are made a charge upon the real estate, power of sale is given, and the time of payment of legacies is named. In the thirty-ninth clause, the time within which sales of real estate are to be made (five years), is fixed, and a provision is made that the legacies of any parties who shall by suit seek to compel a division of the estate or payment of a legacy which may make ex-

pense or cause loss, shall be null and void. By the fortieth clause of the will, Horace T. Cook, Charles G. Briggs and Howard Soule are named as executors; and lastly, the will directs that should any of the heirs at law or next of kin contest or dispute the instrument, he shall take nothing from the estate. The will covers eighteen pages of legal cap paper, but, with the exception of the names of the legatees, and the amounts of their several legacies, its provisions have been practically indicated. The attestation clause is perfect, and the instrument appears on its face to have been duly signed and published.

The first codicil, bearing date the 22d day of March, 1881, witnessed by the same persons, refers to the will, and particularly the third item thereof, and merely corrects the names of the two devisees named therein, which had been interchanged, applying the christian name of the one to the other, and *vice versa*.

The second codicil, dated March 25, 1882, witnessed by the same persons, refers to the will. In the first clause is a devise for life of a farm to the testator's brother (since deceased) and upon his decease to his grandchildren. In the second clause, is a legacy of $3,000 to Charles F. Durston. In the third are legacies of $1,000 each to five clergymen. In the fourth, the thirty-seventh item of the will is quoted and revoked. The same provisions are then made for the payment of the income of the residuary estate, as in the will, except that the names of four of the beneficiaries are omitted. One new name is added. Of the principal, not to exceed one ninth is given to the heirs of each of these parties, in the same manner that the

residuum was directed to be distributed by the will to the persons named in item thirty-seven, and the balance to be distributed among the three charitable institutions named in the thirty-fourth clause of the will. The third codicil, dated March 7, 1884, refers to the will and the former codicils. In the first clause the farm, of which the use is given to two nieces, in the third item of the will, is devised absolutely to them and one other niece; and each of the three is given $1,500. In the second clause the legacies of three nieces are increased to $3,000 each. In the third and fourth clauses sixteen legacies are increased $500 each. In the fifth clause a legacy of $5,000 is reduced to $3,000. By the sixth clause the sum set apart in the will, of which his housekeeper is to have the income, is increased from $1,500 to $2,000, and, by the ninth clause, she is given the use of the testator's residence for four years. By the seventh, eighth, eleventh to eighteenth clauses, inclusive, additional pecuniary legacies are given. By the tenth the provision of the will for a monument, which had been subsequently erected, was canceled. In each of the nineteenth, twentieth and twenty-first items the use of $2,000 is given to a nephew for life, and, in one case, the principal, after the nephew's death is given to his children who may survive him. By the twenty-second, twenty-fourth and twenty-fifth clauses legacies of $1,000 each are given to nine children and a grandchild of a nephew, and nieces of the testator. By the twenty-third clause the legacy in the twentieth item of the will, to Howard Soule, is increased to $5,000. The twenty-sixth, twenty-seventh and twenty-eighth clauses of this

codicil specify the time at which certain legacies of the will and third codicil are to be paid. The twenty-ninth clause is an amendment of the thirty-fifth item of the will, relating to the cemetery fund, providing that the income be expended under the direction of commissioners of the "Soule Cemetery," to be appointed by the Common Council of the city of Auburn. There are two clauses numbered "thirty." The first gives $1,000 a year, for six years, to each of the executors, in addition to his commissions. The next clause directs that the preceding legacies shall have a preference over the payments to be made under the following item. The thirty-first clause has three subdivisions. After reciting the change made in the residuary clause of the will, by the fourth item of the codicil of March 25, 1882, it is as follows:

First. That Howard Soule, of Syracuse, N. Y.; Fanny J. Green, of Port Byron, N. Y.; Mary J. Paige, of Sennett, Cayuga county, N. Y., and Charles F. Durston, of Auburn, N. Y., shall be the four (4) persons who, and their heirs that may respectively survive them, that shall have the income of my rest and residuary estate, willed to my executors, in and by said item fourth (and which may remain after satisfying the several legacies mentioned in my will, and in the codicil of date March 25, 1882, and this codicil, as they remain in force at my decease), of said codicil for the period of five (5) years, and my executors will pay over the same to them, share and share alike, annually, and in the event of the death of either of them, either before or after my death, then to pay over the share (one fourth), to the heir or heirs of such person so

dying; and, at the end of five (5) years, to divide among them or their heirs surviving them respectively, the sum of one hundred thousand dollars ($100,000), if there be that sum belonging to said rest and residuary estate, and if not that sum to so divide, then what sum there may be under said amount, share and share alike, or one fourth of said $100,000, to each of said four persons, viz.: Howard Soule, Fanny J. Green, Mary Paige, and Charles F. Durston, or to the heir or heirs of either of said persons, who may die before said division may be made."

The second subdivision provides for the payment to each of the three charitable institutions before named, of $15,000 out of the residue of the estate, making altogether $20,000 to each. By the third subdivision, the balance of the property, if any, is divided among the legatees named in certain specified clauses of this codicil, and the original will and second codicil upon the basis of the sums given as legacies. The thirty-second clause contains a direction as to forfeiture by any legatee contesting the will. By the thirty-third clause, Charles G. Briggs, Charles F. Durston and Howard Soule are named as executors, Durston being substituted for Horace T. Cook; and, by the last clause of the codicil, it is provided as follows: "If by inadvertence, I have omitted the name of any person or persons, who shall be heirs-at-law at my decease, I direct my executors to pay such person or persons a legacy of $1,000, to each of them, if they see fit and proper."

A fourth codicil is dated May 21, 1885, by which the above named executors are re-appointed, their

powers as to transferring and selling securities, etc., are specified, and authority given to the Surrogate, in case of death or vacancy in the number, to appoint to such vacancy, first, George S. Everts, second, Silas Wright, and third, George H. Green.

This analysis of the will and codicil is thought to be proper, in view of the contention upon one side of the case, that a person, in the feeble condition of the testator, could not have understood the provisions of the will, owing to their intricacy ; and, on the other side, that the will and codicils are simple in their meaning and purport, and, if at all involved, only so in their legal phraseology.  Counsel for the proponent says the scheme of the testator was simple, and what he intended is perfectly evident.  The difficulty is not as to what was in the testator's mind, but as to whether the language used expresses his intent.  The counsel for the contestants argues that the provisions of the residuary clause are of doubtful legality, as being in contravention of certain statutes, and claims this is evidence, that they were not understood by the testator.  If the decedent is found to have been of testamentary capacity, at the time of the execution of the will and codicils, being a man of unusually advanced age, and consequently of weakened powers, in the circumstances of the case, it is necessary to decide, that he fully understood the nature and consequences of his testamentary act; and this must be determined from evidence *aliunde* the formal execution of the will. The fact that a will is illegal in some of its provisions can be no evidence to show that the attempted disposition was not understood, unless the testator was a

lawyer and well acquainted with the law. It would appear most useful to endeavor to view a will from the testator's standpoint, rather than that of the scrivener who drew it, and, if it appears that the will as dictated by the testator, was comprehended by him, and that his ideas have been accurately expressed in the will, although in language more obscure than is ordinarily used, and not readily understood by a stranger, it must be held that the will, in this respect, complies with the law, although for some other reason, it may not do so.

The first inquiry, however, in this case is: Did the testator have legal capacity to execute a will at the times of signing the will and codicils?

Much evidence has been given upon this subject but it was not contended by the argument of the counsel for the contestant that Lyman Soule did not have mental ability to make a will of any kind and under any circumstances. On the contrary, it was conceded, he might have made a lawful will at the time of the transactions in question. The evidence to support the theory of mental unsoundness was, the age of the testator, impaired sight, attacks of vertigo, attended by brief unconsciousness, forgetfulness, losing his way and having to be assisted home, and sometimes to his room, physical exhaustion, inability to read papers, making radical changes in the disposition of his property in the last years of his life, frequently declaring that he could not do business, and surrendering up most of it into the hands of others. One witness testified to one occasion when Mr. Soule had an attack in a store in 1880, when he fell out of his chair and remained unconscious, until after a doc-

tor had been brought in and had administered some
remedy, more than twenty minutes.  It is not proven
what the character of the illness was, but it appears
by the evidence of the same witness, that " Uncle
Lyman," as he was called, came to the store the next
day, and asked if he had done any damage, and re-
quested that the matter be kept quiet.  One witness
testified to meeting Mr. Soule near the city limits
when he appeared to be lost—in 1883 or 1884.  The
snow was deep, and the witness took him in his sleigh
to ride home.  He asked witness what certain places
were, with which he had been familiar.  He was in
the sleigh six or seven minutes, and, before he reached
his home, he expressed surprise that he had gotten
lost.  Several other witnesses tell of meeting him
when he inquired for places which had been well
known to him.  In nearly every case, it is shown that
Mr. Soule appreciated the information given, and
usually acted in accordance with it.  Considerable
evidence is also given to show that he failed to recog-
nize people, and forgot that he had met them a short
time before.  It does not always clearly appear why
he did not recognize them, but, in most instances, it
does appear that he acted rationally upon being told
who the persons were.  Even upon the evidence
presented by the contestant, the condition of mental
alienation, if such it be, was not continuous, and fails
to establish the theory of *senile dementia*.

Upon the part of the proponents, it is shown that,
up to the time of the execution of the third codicil,
and subsequently, the testator collected money upon
mortgages and for rent of houses owned by him, gave

receipts therefor, and appeared to the persons with whom he transacted business to be able to understand what he was doing. In October, 1883, he received money upon a mortgage, signed a receipt for it, and indorsed the payment upon the mortgage. The party who made the payment had had many similar business transactions with him, and did not notice anything unusual. In January, 1884, an attorney at law, who was acquainted with Mr. Soule, came to see about selling him a mortgage, found him at the bank where he had his desk and papers, told him about the mortgage and what he wanted. The testator agreed to meet him at his law office at two o'clock in the afternoon. He met his engagement promptly, examined the mortgage, objected to it because it ran too long, and finally refused to take it, because of the time and of its being payable in small instalments. The witness observed nothing different from what he had seen of the testator for a good many years.

A few weeks before he had a conversation with him in regard to a law suit, which has been tried in 1855. The testator told over the details, of which the witness was cognizant, accurately and rationally, and inquired interestedly about people they had both known in former years. The testator was a member of a fire company. He occasionally met the members at their house, as late as 1882 or 1883. He lent the company $200, in 1881 or 1882, and took a note. Payments were made from time to time. At one time he made them a present of $50. In September, 1884, the note was placed in the bank for collection. He met one of the men, who had made payments, and

told him the note had run long enough; whereupon the note was paid.

In 1884, one of his tenants, who kept a restaurant, told him he wanted more room. Mr. Soule said the tenant next door was going out, and he would see what he could do for him, but advised him not to be too hasty about it. In November, 1883, he made a contract with one of his tenants for the sale of a store, title to pass on the first day of May, 1884. The deed was given at the time named, a mortgage given for a part of the purchase-price, and a check to Mr. Soule for the balance. The negotiations were made in person. Pending the negotiations, he asked a friend to go in and look at the store. When told that he did not want to buy, he replied: "I would like to have you go in and look at it any way." This was done. Two or three times afterwards, and in 1884 and 1885, he told his friend he had sold the store, intimating that the looking at it had stirred the matter up, the purchaser being the occupant at the time.

In the fall of 1885, a short time before his last sickness, he drove out to his tenant houses. He mentioned particular houses he wanted to see, expressed pleasure at riding, asked the man who drove to take him to the barber-shop to be shaved. He became ill, and concluded to go home. The driver says he said nothing out of the way. In 1884, he met the husband of one of his nieces, who lived in Sennett, where he had formerly resided, and asked him if a certain farm would bear a thirteen thousand dollar loan. At one time he said to this witness, "John when you go home,

tell your young minister I have been making a new codicil to my will, and have left him $1,000."

This young minister was one of the clergymen named in the second codicil as legatee, to the amount of $1,000. Subsequently he told this witness he was going to make a new codicil, and put Mate's name in it. After that, in 1884, the witness met him, when he said : " John when you go home, you tell Mate I have been making a new codicil to my will and have put her name in it." (Mate was the witness' wife and one of the principal residuary legatees.) He then showed the witness a list of his property, mortgages, etc., which he had to collect.

A large number of mortgages and checks, bearing the indorsement of the testator, were read in evidence; also checks signed by him. Twenty-eight checks were presented, which were filled out and signed in the handwriting of the testator, bearing date of 1884, which had been presented and paid at the bank in the usual course of business. There were also produced fifty-two checks, issued in 1885, all bearing the autograph signature of the testator, but filled out by others ; and fifteen checks, made the same year, which were both filled out and signed in his own handwriting, and which had been regularly paid.

One witness, produced by the proponents, testifies to being with Mr. Soule upon two occasions, the last about four months before his death, when he was ill upon the street, and Mr. Soule told him that he had one of his dizzy spells; said that he had had them some little time. About six months before, the witness walked with him, when he had one of the dizzy attacks, which

passed off after a time, when he said he was all right, and the witness left him. The witness says the testator always recognized him, and that he met him frequently up to the last month of his life.

It is proven that the testator's habit, until a few weeks before his death, was, about eight o'clock in the morning, to go to the National Exchange Bank, where he had his papers, at first in tin boxes kept in the vault, and, from the spring of 1884, in a safe procured for that purpose. The bank was over a quarter of a mile from his residence. He would often be the first person to arrive in the morning. He was a director of the bank, and had a key to the outer door. He would ask the teller of the bank for his tin boxes, and, going into the back room, would take out his papers and examine them. Payments were made to him there, and receipts either drawn by him or by the cashier of the bank, and signed by him, were delivered; and the papers being returned to the tin boxes, were again placed in the vault or were put in the safe.

The cashier and teller of the bank, who saw him and conversed with him nearly every day, saw nothing irrational. The county clerk testifies that for many years, and down nearly to the time of his death, Mr. Soule brought papers, mortgages and assignments to his office, to be recorded, and frequently asked him to examine the records to ascertain if there were any prior liens upon the incumbered property; and would ask for and take away papers which had been recorded. The office was over a half a mile from his residence, and he usually walked to it. On one occasion, a short time before his death, the witness saw him getting on

a street car, and expressed surprise at his riding, as it was so unusual an event, when Mr. Soule replied: " He didn't think he would get there himself."

One witness, who rented a store building of the testator, testifies that he paid him the rent monthly down to near the time of his death, and took receipts, all of which were in Soule's handwriting, down to the first of June, 1885. Receipts given in June and July, 1885, were drawn by the witness, and signed by Mr. Soule, at the witness' place of business.

The testator died November 28, 1885, of acute bronchitis. The will and first two codicils were witnessed by two gentlemen, who were officers of and in daily attendance at the bank, where the testator had his papers, and of which he was a director. They knew him intimately. One of the witnesses, Mr. Newton, had been acquainted with him fourteen years; had seen and conversed with him almost daily from the time he brought his papers to the bank, in 1878, to about three months before his death. He had known of his extensive business transactions, and had taken part in many of them, both as an officer of the bank and as an assistant of the testator. He, as well as the other witness, testifies unqualifiedly to the opinion that the testator was of sound mind and memory, and in all respects competent to make a will at the time of the execution of the will and first two codicils in question. The third codicil was attested by men who were acquainted with Mr. Soule. One of them was a physician, who had attended him professionally upon two occasions, and who testifies to a conversation with him at the time of the execution of the

third codicil. Both witnesses say unequivocally that, in their opinion the testator was at that time of sound and disposing mind and memory.

The witnesses to the fourth codicil, dated May 21, 1885, were both well acquainted with the testator. One was a neighbor. Both of them say, without hesitation, that he appeared in his right mind, and seemed to exercise his own free will.

In addition to the evidence of the acts and conversations of the testator, extending over a period of several years immediately prior to his death, and the opinions of some of the witnesses, who were called to detail them as to the impressions made at the time by such acts and speech, and the opinions of the subscribing witnesses to the will and codicil, expert testimony has been given. Four physicians on the part of the contestant; and three, including the state commissioner in lunacy and the superintendent of the State Asylum for Insane Criminals, on the part of the proponents, were produced as witnesses. They testified to their opinion, in response to hypothetical questions, propounded by the respective counsel. To a question presenting very fairly the principal facts established by the whole evidence five of these witnesses agreed in giving the opinion that a person thus described, would be one of sound mind. The other two witnesses answered adversely in reply, to a question embracing only the facts testified to by a portion of the contestant's witnesses, and without the benefit of the entire history given in the case.

Upon the whole evidence, the conclusion is imperative that the testator, at the time of the execution of

the will and codicils, possessed legal testamentary capacity, that he was able to understand the condition of his property, his obligations to those who were related to him by ties of blood, or who had legal or moral claims upon him, and the character and effect of the provisions of his will and codicils. While it appears that his perceptive powers and memory were somewhat impaired, as would be naturally supposed, in a person of his advanced years, his regulative faculties and business acumen are shown to have been remarkably well preserved. Cases may be cited in which legal capacity to make a will has been upheld, in which there is apparently much less ground.

The case of Horn v. Pullman, decided by the Court of Appeals in 1878, 72 N. Y. 269, involved the question of the testamentary capacity of a man eighty-three years of age, who was suffering from infirmities incident to advanced age, and had been previously afflicted with sickness, which left him enfeebled in body. His sight and memory were considerably impaired. He took no active part in business for several years before his death, which occurred within three months after the execution of the will. He had grown more reserved and less cheerful than formerly; would repeat questions sometimes two or three times during a conversation. He did not recognize readily some persons with whom he was acquainted, and had to be told who they were. The evidence altogether showed that the testator's mental and bodily powers were impaired, but failed to show that he did not understand his relations to his family, the condition of his property, and the effect of his will. There was evidence

in the case of circumstances tending to show that he acted intelligently in the transaction of some trivial matters of business.

The physician who attended him during the last year of his life, and who was one of the subscribing witnesses to his will testified that his memory of recent events, appeared to be impaired and that he was bodily and mentally infirm ; but, in the witness' opinion, those infirmities did not affect the testator's competency to make a will.   The court adopts this view of the case, and lays down the rule that a will should be sustained if the testator is shown to have had sufficient intelligence to comprehend the condition of his property, his relation to those who are or may be the object of his bounty, and the scope and meaning of the provisions of his will, provided it be his free act.   Many cases might be cited to show that mental impairment alone is not deemed sufficient to defeat a will, if the person who made it, appears to have had sufficient understanding to appreciate its effect.   The courts have also held that a person who has sufficient capacity to make the simplest will, who is *compos mentis,* can make any will, even the most complicated.   Delafield v. Parrish, 25 *N. Y.* 97.

Within all the authorities it must be held that Lyman Soule had legal testamentary capacity, at the time of the execution of the will, and at the time of executing the codicils.   His numerous business transactions and conversations, all conclusively proved that he was *compos mentis.*

A question of more difficulty to decide, upon all the facts of the case, is whether the instruments ad-

mitted to probate, as the last will and testament of the testator, and as codicils thereto, were duly understood by him, and were his own free acts, or whether they were obtained by undue influence.

Had the parties who wrote the instruments in question been entirely disinterested, and the testator been in the full possession of his normal faculties and senses; had his sight been good, his memory unimpaired and his actions independent, the presumption would follow that he fully understood the provisions, and desired to have them carried into effect. But the will and first two codicils were written by a lawyer, who is made a legatee to the amount of $2,000, and the third codicil was drawn by and is in the handwriting of another lawyer, who is given thereby one fourth of the income of a large residuary estate for five years, and, at the end of that time, the sum of $25,000, and who is named therein as an executor, at a salary of $1,000 a year for six years, in addition to the commissions allowed by law. Upon the issue as to undue influence, the question of the burden of proof is in the circumstances, not free from difficulty, and the decisions of the courts, in other cases, have been examined to ascertain the proper rule to be adopted in the present controversy. ·

The case of Marx v. McGlynn, 88 N. Y. 357, was one in which the testator had made a will in favor of his religious adviser, and the question of presumption as to undue influence was raised.

The court held that it is not sufficient to show that a will is the result of affection or gratitude, or the persuasion of a friend or relative, which he may legi-

timately use, but the influence must be such as to over-power the will, producing a disposition of the property, which the testator would not have made if left free to act.   Where, however, a weak-minded person makes a will in favor of his priest or confidential adviser, to the exclusion of the natural objects of his bounty, the law presumes undue influence, and, in order to sustain the will, there should be some proof besides the mak-ing of it.   This presumption, however, is one of fact, and, where the evidence tends to show that the will was the voluntary, deliberate act of a person of ordi-nary intelligence, prompted by affection, without im-proper persuasion, and the will is not unjust, a decree admitting it to probate will be upheld.

Two kinds of undue influence are referred to as being recognized by the law; one of coercion or threats of injury by which a person is compelled to act contrary to his desire, which cannot often occur under the present system of executing wills; the other, and more common one, in which the mind of the person is wrought upon through constant persuasion and men-tal or moral pressure, or appeals to hope or fears, continued until the victim, for the sake of peace, is compelled to surrender his own wishes, and do an act which he would not do or desire to do if left freely to act his own pleasure.

The case of The Will of Martin, 98 *N. Y.* 193, was one in which probate was contested on the ground of undue influence.   The testatrix left three sons, one of whom was named as executor of the will.   He had communicated to the scrivener the provisions to be inserted in the will, and was himself a beneficiary.   It

was alleged against the will, that it was obtained by undue influence. The court held that the burden of establishing the defense was upon the parties making the attempt, and as the testatrix was found to have had testamentary capacity, and a present knowledge of the will, it was held that it could not be avoided, except by proof of influence amounting to force or coercion.

The case which has been most urged upon the attention of the court as an authority, and which, in many of the facts involved is most like the case at bar, of the decisions of our highest court is that of the Matter of The Will of Smith, 95 *N. Y.* 516. Eliza M. Smith, at the time of making her will, was over seventy-five years of age. She had no near relatives. The lawyer who drew her will was the chief beneficiary. The testatrix was infirm mentally and physically. She had made three previous wills, two of them made in the same year as the last. In each of these the contestant was named as legatee. In the first two she was residuary legatee, but in the third the proponent was named as residuary legatee. In the fourth will, the one in question, the contestant was not mentioned, and the draughtsman was given the bulk of the property. The will was drawn and executed five days before the death of the testatrix. The court says, the fact that the beneficiary was the attorney of the decedent, does not alone create a presumption that a testamentary gift was procured by fraud or undue influence; but, when a person of advanced years, and mentally and physically infirm, has made his attorney the principal beneficiary, and it

appears that this was contrary to previously expressed testamentary intention, that the attorney was the draughtsman of the will, and took an active part in procuring its execution, and that the testator acted without independent advice, the burden is imposed upon the attorney of satisfying the court that the will was the free, untrammeled, intelligent expression of the intention of the testator.

The case at bar differs from all the cases cited to such an extent that the burden of proof upon the claim of undue influence, is left almost entirely to the judgment of the court, as a new question.   It may be said that propriety at least, would dictate that a person, deriving a benefit from the will of another, should not conduct the affair.   *Qui se scripsit heredem*, or whoever draws a will in his own favor, does a thing which ought to excite the suspicion of the court, and call upon it to jealously examine the evidence, and be judicially satisfied that the paper propounded expresses the true will of the deceased, before admitting it to probate.   The fact that the testator had full testamentary capacity, and knew the contents of the will, is sufficient to remove such suspicions, and to place the burden upon the contestants of proving undue influence.   It was said by the Surrogate in Wilson v. Moran, 3 *Bradford*, 180 : " A will by a client, in favor of an attorney, is not absolutely invalid.   In such a case, there is no testamentary incapacity, but still the circumstances call for the largest degree of circumspection and vigilance to see that the act was in consonance with the views and wishes of the testator, and was not the result of influence, exercised through the

medium of the existing confidential relation.    It is in substance a rule of evidence to the effect that proof of formal execution alone is not enough to force a conclusion, and that, even after the factum is formally established, the burden remains upon the proponent to show, by additional testimony spontaneousness and volition." In view of the propositions contained in the will of Smith (*supra*) the doctrine laid down in Wilson v. Moran, is only to be applied when the testator is shown to have been dependent upon his attorney for information concerning the contents of the will; or where the testator was an infirm person, and the provisions of the will are such as to create suspicion, or the circumstances, under which it was executed, are such as to lead to the inference of undue influence ; as in the case of Rundell v. Downing, 5 *N. Y. State Rep*. 253.

It does not appear what may have been Lyman Soule's purpose as to the disposition of his property prior to the will executed June 24, 1880, or that he was then mentally infirm.    The legacy to the attorney who drew the will was small compared with the size of the estate.    It would not seem to be unreasonable to assume that the legacy was given in consideration of services rendered.    There is not enough evidence to raise the presumption that this gift was procured by fraud or undue influence, and, if there was, the will being republished at the time of the execution of the third and fourth codicils, when other advisers were employed, no other evidence need now be considered, as regards the validity of the will and the first and second codicils.

Before proceeding to examine the evidence relating to the third codicil, as the proponents have referred to the fact that this petitioner, upon probate, consented to the decree which she seeks to overthrow, it may be proper to refer to some authorities upon the question of the burden of proof in a proceeding like the present for a revocation of probate. In an early case in Surrogate's Court of New York county (Collier v. Idley's Executors, 1 *Bradford,* 94) the history of the law relating to proceedings for the revocation of probate were carefully examined, the law was expounded substantially as in the case of Gouraud, in the Court of Appeals, *infra,* and the question of the *onus* of sustaining the allegations against the will was fully considered. It was there contended upon the part of the proponents that the probate of the will was *prima facie* evidence of its validity, and that the burden of overthrowing it lay with the contestant. The Surrogate held that the proponents were bound to prove the will by original proof, independently of the first trial, but said that : "Where allegations are filed with the view of raising some issue, narrower than the broad and general one of invalidity of the will and the incompetency of the proof, if such a course be regular, the rule of evidence, as I have laid it down, may perhaps be varied." The case of Post v. Mason, 91 *N. Y.* 539, was an action brought in the Supreme Court to have the probate of a will vacated and the defendants adjudged to hold property as trustees, which had been given them individually by the will. One of the defendants was an attorney at law, who at the death of the testator, and for one or more years

previously, had been his friend and counsellor. He wrote the will and was named as one of the residuary legatees.

The testator's property amounted to about $200,000, and the attorney's share was about $17,500. The Court of Appeals in its opinion in that case, says: " The relation of attorney and draughtsman gave, no doubt, in the case before us, the opportunity for influ- ence, and self-interest might supply a motive to un- duly exert it; but its exercise cannot be presumed in aid of those who seek to overthrow a will already es- tablished by the judgment of a competent tribunal, rendered in proceedings to which the plaintiffs were themselves parties, nor in the absence of evidence, warrant a presumption that the intention of the testa- tor was improperly, much less fraudulently, controlled."

In the present case, the testator was a person of advanced years—about ninety—when the third codicil was executed he was physically infirm, he was slow of movement, his sight was poor and he depended upon others to read to him. This instrument was in respect to the most important provisions, contrary to his previous will and codicils. The attorney and draughtsman was one of the chief beneficiaries. These facts require that the proponent should satisfy the court by a clear preponderance of evidence that the testator fully understood the nature and consequence of the testamentary act. There is no direct proof of any attempt on the part of the attorney or those who were associated with him, to induce or influence the testator to make this codicil. There had been one quite radical change in the testamentary disposition of

the residuum of his property, made by one of the former codicils before the parties who assigned in the making of the third codicil were brought into service.   Four of the nine original residuary legatees had been left out, and one new name added.

It is proven that Mr. Soule had repeatedly, after making the will, expressed his dissatisfaction with his relatives.   He did not live with any of them, or have much intimacy with them.   He was heard to say of Howard Soule, who continued throughout to be one of the residuary legatees, that he liked him, because he stayed away from him, and didn't bother him; that he did not come, until he sent for him.   There is evidence of expressions of affection for Mr. Durston, the attorney who drew the third codicil, made by the testator in the years 1884 and 1885.   One witness says he had a conversation with Mr. Soule, in Mr. Durston's office, in August, 1884.   When asked, if it was not hard for him to come up stairs into the office, Mr. Soule had said: "Yes it is some, still, at the same time, I make it my business, if I can, to see Mr. Durston once a day, for I like the man very much."

Another witness was in the office in the spring of 1885.   Mr. Durston went out to the bank.   Mr. Soule, sitting there, said: "Charley is a good boy, an awful good boy; I wish he was my son."   Another witness says, Mr. Soule in speaking of Mr. Durston, in 1885, told him, he was his best friend, that he thought a great deal of him, and considered him a very honest man; and that he had said in substance the same thing to him at different times before.   Another witness tells

of hearing Mr. Soule speak in high terms of Mr. Durston, in 1884, and of calling him his boy.

In the second codicil, dated May 25, 1882, in the making of which it does not appear that he took any part, Mr. Durston is made a legatee, to the amount of $3,000. It appears that the testator was very frequently in Mr. Durston's law office in the years 1884 and 1885, and that to enter the office he had to climb a very long flight of stairs, with considerable difficulty. Durston attended to the decedent's law business, supervised his loans, made collections for him, and thus much of his time was occupied during the last three or four years of the testator's life. It does not appear whether he received any other compensation than the legacies named in the will. It is shown by the will and codicils that Mr. Soule made provisions in this way to compensate other lawyers, and, in one instance, it is upon condition that no other claim be made. The amount given to Durston is stated to be about six per cent of the testator's property. Prior to the execution of this codicil the testator told the husband of Mrs. Paige, one of the four principal legatees, that he was going to put his wife's name in it, and afterwards told him that he had done so. This legatee had been named in the original will as the recipient of $2,000. With the exception of the change in the residuary clause of the will above mentioned, the scheme of the third codicil, both as to the persons benefited and the proportionate amounts bequeathed, is practically the same as before. The amounts of most of the general legacies are increased, and all the relatives are remembered. From the evidence of the housekeeper,

called by the contestants to show the testator's infirm-
ity, it appears that, during the time of preparing the
third codicil, he was obtaining the names of the chil-
dren of his nephews and nieces.    There is evidence
that the testator knew the contents of the will from the
fact that the first codicil was expressly declared to be
made for the purpose of correcting a mistake in the will.
The naming of so many relatives of remote degrees
of affinity was presumably the act of the testator, or
done at his dictation, as, in the absence of any member
of the family, the lawyer who drew the instrument
would hardly have been expected to have known them.
The claim is fairly made that the execution of the
fourth codicil, the testator being shown to have been
*compos mentis,* proves presumptively that he knew the
contents of the third codicil.    Changes made in the
provisions of the will, increasing legacies of many
parties who were not present, or represented, and
diminishing those of others, seem rather to support
the theory that the testator directed the changes, than
that they were the work of a few conspirators.    By
the will and first two codicils about $75,000 is given
in general legacies, three farms are devised, and the
residue of the property is divided among six relatives
and three charitable institutions.

By the will, as altered by all the codicils, about
$116,000, is given in general legacies, the farms are
disposed of in the same manner, the income of the
balance is given to four persons, three of whom are
relatives, for five years, $100,000 is then to be divided
between the four, the three charities are bequeathed
$20,000 each, and the residue of the property is given

to relatives, in proportion to their general legacies. Assuming the property to be about $500,000, in amount, as conceded, it will be seen that the latter disposition of the property is more equitable : it is more favorable to all the relatives, except the few who happened to be preferred in the earlier instruments. While a disposition is shown to be more careful in providing for all the relatives, no more cogent reason than the donor's whim is given for preferring one to another.

It is in proof that the day before the third codicil was executed, the testator, his nephew, Howard Soule, Charles G. Briggs one of the executors, and Charles F. Durston, were together in a room in the latter's office, with the door shut. The law partner and the clerk of Durston were aware of the fact that the parties were together, and the clerk was instructed not to allow interruptions. A draft or memorandum of the will had been previously made, which was read over to the testator by Howard Soule, who says this was his second visit to Auburn, and the first time, he had seen the testator upon this business.

After reading the draft, and, at the request of the testator, he furnished him with the names of the children of his (Howard's) brother, who were afterwards included in the codicil. He made an appointment to come again the day following. He came from Syracuse the next day, as agreed, saw the engrossed codicil in the morning, and read it in part to the testator. In the afternoon, he read the whole of it to the testator. This was the same day upon which it was executed. He now identifies the original instrument as the one

he read before its execution.    He was present through-out the signing and witnessing of the codicil.    The following day he made and took away a copy of the paper, and also received a copy of the will and first two codicils.    It is urged in support of the good faith of the parties, who took part in the transaction, that Howard Soule would receive less property under the third codicil, than he would have had if it had not been made.    It appears that he had no acquaintance with the attorney who drew the codicil, until the week it was executed.    He is not proven to have had any motive to urge the change in the testamentary provi-sion.    The changes made by the codicil were presum-ably within the knowledge of Mr. Charles G. Briggs, one of the executors, named in the original will, as well as the codicil.    The clause of the third codicil, which has been criticised, is very plainly written. The names of the legatees are mentioned in full, both at the beginning and at the end of the first subdivi-sion.

The amount of the legacies is both written out and twice stated in figures.    It would seem impossible, to even glance at this subdivision of it, without learn-ing who the beneficiaries are.    The fact that the codi-cil was read to the testator, by his relative and chosen adviser, is fully established.    It cannot be held that Lyman Soule was the victim of deception or imposi-tion without involving all the parties, who were present at the time the codicil was prepared, in an unlawful and contemptible conspiracy.    The facts do not create such a presumption.    In the absence of the positive proof or circumstantial evidence, sustaining

such a conclusion, and admitting of no other reasonable hypothesis, the finding must negative the theory of fraud.

The conclusion is that, at the time of the execution of the third codicil, the testator was of sound mind and memory, and competent to make a will; that the codicil was his free act, and that it was in all respects properly and legally executed, and that the testator was not under restraint.

It is claimed, on the part of the respondents in this proceeding, that the petitioner is estopped from maintaining it, by the fact that she has derived a benefit under it, and accepted money paid in pursuance of the decree admitting the will to probate. Certain concessions were, at the request of the parties, granted upon probate, and incorporated in the decree, as stated above.

It is not demonstrated, nor is it clear to the court, that the petitioner derived any practical benefit from the adjudication in this respect. It is proven that, after the will was admitted to probate the petitioner, Mrs. Rood, as assignee, received from the executors a legacy of $500, given by the third codicil to George A. Rood, her son, less the rebate of interest. It is now urged that, by this act, she is estopped from controverting the provisions of the decree.

Upon the trial of this proceeding, after the evidence was closed, the petitioner, by her counsel, made a tender in court of the sum of $496.85, stating that he desired to tender the amount advanced to Mrs. Rood, for George Rood's claim, and interest to date, and to deposit that amount in court for the benefit of the

estate. No objection was made to the form of the tender. Two questions are thus presented:

First. Was the petitioner, Mrs. Rood, estopped from contesting the validity of the will by accepting the money?

Second. If she was so estopped, does the tender or offer to return the money, after the proceeding was commenced and continued nearly to a completion, restore her to the position she occupied before the money was received?

It will be seen by the following authorities that, after some difficulty, the courts have decided that a decree upon probate of a will, does not preclude a party who opposed it from litigating over again the same questions in a proceeding like the present. It was decided by the general term of the Supreme Court, in the First Judicial Department, in 1883, In The Matter of the Will of Gouraud, 28 *Hun*, 560, that it was not the object of the statute relating to a revocation of probate of a will, to allow next of kin who had filed objections to the original probate, and contested it, to file the same objections, and enter upon a new contest on the issues already tried and determined.

This decision was overruled, however, by the Court of Appeals, 95 *N. Y.* 256, and that court held that upon a proceeding for revocation of probate, the whole case was left open, and that the contestant had the right to have the same question then litigated, tried and determined, the same as if no adjudication had been had thereon. The court says, a party desiring to contest the probate in that way, has the right to try over again upon the same, or upon additional

evidence, the very questions which were litigated, when the will was first proposed for probate. If the petitioner has been precluded from obtaining the relief asked for her in her petition, it must be by her acts, in relation to the decree, and the parties interested therein and such as to constitute an estoppel *in pais*. The acts or admissions relied on must have been intended to influence the party setting them up; they must have had that effect, and the denial of the admissions, and the grounds upon which the acts were based must operate to the injury of the other party. A party cannot enjoy the rights awarded to him by a judgment of decree and repudiate its force, as an adjudication.

The case of Mills v. Hoffman, 92 *N. Y.* 181, which originated in this court, is in many respects similar to the one at bar. An action had been brought by a legatee against an administrator, with the will annexed, and others for the purpose of determining the rights of the parties in the estate and for an accounting. A judgment had been rendered in the action, determining the question involved, and adjudging that the administrator upon compliance with its terms be discharged from all demands. The administrator performed the requirements of the judgments, and paid over among others, the share of the defendant, who was then an infant. The payment was made to her general guardian. After the defendant became of age, with full knowledge of the term of the judgment, she received from her guardian the moneys so paid to him. She also instituted proceedings to vacate the judgment, upon the ground that the appointment of a

guardian *ad litem* for her in the action was irregular. An order was granted vacating the judgment, so far as she was concerned. Four years afterwards, she commenced proceedings in Surrogate's Court, to compel the administrators to account. It was held, upon appeal, by the Court of Appeals, that the proceedings were not maintainable. That although the judgment in the action had been deprived of any force, as an adjudication, she by the acceptance of the money paid, estopped herself from controverting either the judgment or the settlement made thereunder. .

In the case at bar it appears that the petitioner did receive the money from the executors of the will. A party, who takes personal property under a will, to a certain extent derives title from the probate. The petitioner would not have had a right to demand payment of the bequest, except for the decree admitting the will to probate. By the statute, authorizing the proceedings for revocation, the effect of the decree as an adjudication, was suspended, except for the act of the petitioner, in accepting the fruits of the decree, and of the will as thereby established. At the time this proceeding was instituted, she had in her possession the money which she had received in the nature of a bequest, and to which she or her assignor would not have been entitled, if the will had been denied probate. I think the petitioner was not at liberty to repudiate the terms of the decree, which she had ratified in accepting the bequest; and that she is estopped from claiming a revocation of probate, unless by her subsequent act she had made full restitution. Did the tender of the money in court have the effect to restore

the petitioner to the rights she possessed to contest the will by a proceeding like the present ?   A tender made in court for the purpose of avoiding an estoppel is an anomaly.   The theory of a tender is that the party who is injured by the act of another receives sufficient amends in accepting a tender, and ought not to be allowed to further maintain his action or hold his security. There are different kinds of tenders ; those which are held to discharge the debts, and those where an offer is made of purchase money, upon condition of the delivery of a deed, or of the payment of a debt, on condition of the return of a pledge.   The Code provides for a tender, after a suit has been commenced in actions for a sum of money only.   At common law, payment of money into court was made when tender had been made before suit brought, or when no such tender had been made, if leave was granted by order of the court.   Our courts, in some rare instances, have held this rule to be in force.   Had the petitioner made a lawful tender of the money received for legacy, for the purpose of making full restitution to the representatives of the decedent's estate, before filing her petition in this proceeding, it might well be said that no injury could thereafter have been alleged on the part of the executors.   Having proceeded to obtain a revocation of probate, and caused costs and expenses of a trial, it would be contrary to precedent to allow a tender or deposit of the original account with interest to avoid estoppel, at the close of the trial, if it could have that effect at any time after the proceeding was instituted.   In the case of Hunter v. LeConte, 6 *Cowen*, 728, it was held that if costs had been incurred by a

landlord in distraining goods for rent, a tender to take away the right of distress, must include the costs.

The court says it is highly reasonable that costs should be paid when they have been properly and fairly incurred. It was so held also in the case of Eaton v. Wells and others, 22 *Hun*, 123, an action for the foreclosure of a mortgage, in which a tender of the amount of the mortgage, without costs, was made after suit was brought, and without an order permitting a tender without costs. It is very doubtful, however, if any tender or deposit of the moneys in court, after the commencement of this proceeding, could be of avail to the petitioner. It has been held in another state that, where an execution has been levied on goods and chattels which have been sold, and the proceeds paid over to the creditor, he cannot maintain an action to obtain a new execution upon the ground that the goods were not the property of the debtor, until he has refunded the money thus received, or tendered it back. Batchelder v. Wason, 8 *N. H. Rep.* 121. In a case in this state, in which the plaintiff sought to recover on one of two notes the consideration of which was the assignment of a judgment held by him against the defendant's brother, it was proven that, after its maturity, the note was transferred to the plaintiff, and the judgment assigned to him also. There was no offer made by him to assign the judgment. The court held that, if either party would sue upon this agreement, the plaintiff for not paying or the defendant for not transferring, the one must aver and prove a transfer or tender, and the other a payment or tender. Berringer v. Wengenroth, 6 *Hun*, 531.

Both upon principle and authority, I think the tender or offer of deposit came too late to affect the question of estoppel, and that it was properly urged as a bar to this proceeding.

An offer was also made, at the same time, to add another party as petitioner,· against whom it is not shown the same defence could be made, but, as the statutory time of limitation of commencing the proceeding is passed, and some of the parties are infants, and all are not represented, the amendment cannot be held to give the new petitioner the same right he might have had, if joined originally in the petition.

It is claimed by the petitioner that the trusts, attempted to be created by the will, and the thirty-first item of the third codicil, are prohibited by the statutes against perpetuities, and are consequently void. The law limits the suspension of the absolute ownership of personal property to two lives in being, at the death of the testator, and it is contended that the ownership of the property cannot be absolutely determined until after five years, which may exceed the time allowed by statute.

It is also urged that the will violates the statutes forbidding a direction as to the accumulation of interest except for the benefit of minors. The decision of these questions, which are perplexing, is not useful or proper at this time. The inquiry now is whether the will was legally·executed, and if it shall stand as proven, or if probate shall be revoked, and the will or codicils be set aside. The construction of the will, and the decision as to the legality of particular provisions must be had either upon the judicial settlement of the

accounts of the executors, or a proceeding for that purpose in an action brought in another court.

It being determined that the will and codicils were duly signed and published by a competent person, that they were his free acts, and that he knew and appreciated their provisions and effect, this application is denied. Costs are allowed to the successful parties from the estate.

[NOTE.—See former proceedings in this estate: 6 Dem. 137.]