This testatrix, as to the residuary estate, died intestate.

Submit decree admitting the will to probate, and in accordance with the above decision.

——————◄•►•——————

NEW YORK COUNTY.—HON. RASTUS S. RANSOM. SURROGATE.—April, 1890.

MATTER OF DeBAUN.

*In the matter of the application for the probate of the will of* HOUSEMAN DeBAUN, *deceased.*

Decedent was a man mentally competent but of very weak will and entirely under the domination of his second wife, a woman of boisterous and violent temper, and dissipated habits. Except on rare occasions she refused to permit him to leave the house, and when he went out she nearly always accompanied him. In all important matters his free agency seems to have been overcome. She was positive and aggressive, he was meek and cowardly. Soon after her marriage she announced her purpose to compel her husband to leave his estate to her to the exclusion of his children by his first marriage, one of whom was a helpless imbecile living upon the bounty of decedent's first wife. About three years after the marriage decedent went with his second wife to the office of an attorney and their wills were prepared in accordance with the directions given by her. The will of decedent gave with the exception of insignificant legacies to his children, to his second wife his entire estate, a large part of which was in expectancy and would not vest in him until the death of his mother. At the same time, the second wife who had a property very much larger than decedent's, executed her will leaving all her property to him. The husband lived for six years afterwards without revoking his will. *Held:* that if the scheme of reciprocal wills was concocted by the wife, he acquiesced in it intelligently, understandingly and voluntarily, under the selfish be-

lief that it would be greatly to his advantage if he survived his wife, and that the will must therefore be admitted to probate.

Under the law the injustice of a competent testator towards the natural objects of his loving kindness and bounty cannot affect the validity of his will.

APPLICATION for the probate of the will of House-man DeBaun, deceased.

The facts appear in the opinion of the Surrogate.

DeWitt C. Van Buskirk, *for proponent.*

S. W. Fullerton, *for contestant.*

James D. Fessenden, *special guardian.*

F. W. Angell, *for next of kin of a legatee.*

The Surrogate.—The paper offered as the will was executed on the 10th day of September, 1880. By it the decedent bequeathed to each of his two sons, the children of his first marriage, the sum of one hundred dollars, and the remainder of his estate, said to be worth about $20,000, is given to his second wife, Josephine, who is named as executrix. Four witnesses attested the execution.

The decedent was married in 1854 to his first wife, and they resided on a farm in Hackensack, New Jersey, in which his mother had a life interest. Their sons, Charles and Edwin, are now thirty-one and twenty-eight years old, respectively, the first named having been an imbecile from birth. In 1868 or 1869 their mother separated from the decedent, and soon after took the children. In 1872 she obtained an absolute divorce in the state of Rhode Island, on the ground of non-support. She took upon herself the

care and support of the children, and thenceforward the decedent did not see them for several years. She again married in 1873. She supported and educated the younger son until he was licensed as a physician and was able to earn his own living. To support herself, she studied medicine, and has been for sixteen years following her profession in this city.

In 1877 the decedent was married to Mrs. Josephine A. Vreeland, he being her fourth husband, and they resided for a time on the Hackensack farm, then in Jersey City, until July, 1886, when they removed to a house owned by the decedent on Nineteenth street, in New York, where he died in July, 1887, at the age of sixty-two. His widow survived him only a few months, dying childless, at the age of fifty-five.

In 1880, about three years after their marriage, while residing in Jersey City, the instrument in contest was executed, and on the same occasion the wife made her will, in which the husband was made her sole legatee. The greater portion of the estate of which the decedent died possessed did not vest in him until the death of his mother, in November, 1885, five years after the date of the instrument in contest. The estate of the wife came to her from her third husband, and is shown to have been worth from $40,000 to $50,000 at her death.

Though allegations were filed against the mental competency of the decedent, and that the paper was not executed in conformity with the statute, no proof was adduced to sustain them. The sole question for my consideration is that of fraud and undue influence alleged to have been exercised in its procurement.

It is seldom that the usual relations of husband and wife to each other are so completely reversed as is shown by the evidence in this case.   Many witnesses were examined, nearly all persons of middle age or past; and the greater number those who had known the husband intimately.   The burden of their testimony is that the decedent was a man of little will. She was coarse, selfish, mercenary, exacting; was indifferent to her own kindred and possessed of an unyielding will.   She had been three times married and once divorced.   The decedent was introduced to her as a man of wealth.   During a courtship that extended over two years he observed in her such perverse characteristics that near the hour appointed for the wedding he was depressed in spirits and was reluctant to marry, and would not have done so if a friend, to whom he had confided his feelings, had not urged him.   From the beginning of their married life her will seems to have controlled in all her relations with the husband.   If her wishes mildly expressed were not complied with she commanded; if commands failed she used threats, and he submitted for the sake of peace.   Except on rare occasions she refused to permit him to leave the house, and when he went out she was nearly always in his company.   In all important matters his free agency seems to have been overcome. Though pet names were publicly used between them, it had become so much a matter of habit as to have no significance, for the testimony shows scarce any declarations of affection on the part of the husband for the wife, and nearly all his statements are strong evidence that none existed.   The case is equally bar-

ren of declarations of the wife of love for the husband. The apparent harmony in their relations observed by one witness when visiting them socially, and by others who met them in business transactions, and which to them seemed evidence of a mutual love and affection, was a result that might be expected between two persons, one positive and aggressive and the other meek and cowardly, and there are abundant proofs of discord throughout their married life, and on all occasions she came out ahead.

Proponent's counsel claims that the exhibitions of the wife's violence were only when she was under the influence of liquor. If not before, certainly very soon after the marriage she was accustomed to use intoxicating drinks to excess, and the habit had so increased that for several years before her death she was a victim of alcoholism to such an extent as to be under disability for days at a time, and to disgrace herself in public. From her own statement, she had once been in delirium tremens, and one witness, called for the proponent, states that during the last three years of her life she was not herself, and was incompetent to transact business. The few who thought their relations were happy and affectionate probably saw them when the wife was at her best, and there were many periods, probably, and some quite extended, when her conduct and language were unaffected by drink. They had no servant or other member of their household, and scarce any social intimates. Occasionally a friend visited them, and when the wife was suffering from her excesses a woman was called in to attend her.

Soon after her marriage she announced her purpose to compel her husband to leave his estate to her, without provision for his sons. She was eight years his junior, and in the ordinary course of nature would survive him. About three years after the marriage, they appeared at the office of an attorney, and she gave directions for the preparation of wills for each. She falsely stated that the decedent's sons had not treated him well, and did not state that one was a helpless imbecile and was living on the bounty of his mother, the husband's first wife. It was only because she believed that, otherwise, the sons could break their father's will (though advised to the contrary) that she directed the insignificant bequests for them contained in the instrument to be inserted, and she suggested the amount of each. She requested two of the subscribing witnesses to be present at the lawyer's office. Though informed that the two were sufficient, she asked that the attorney and another gentleman also act. She directed the husband's will to be first executed, and, though evidently desiring to postpone the execution of her own will, she acquiesced in his wish that both be then signed.

The case is bristling with evidences of the wife's boisterous domination and of the husband's meek submission to her will, and as a whole, it shows that affection was not the motive that acted on his mind when he executed the paper propounded. From his marriage he spoke to friends and acquaintances of the wretched life he was leading. He several times stated his intention to leave his wife, and once made preparations to do so, but was dissuaded. Twice he made

threats of suicide. Though his declarations as proven are not evidence of the facts stated, they do show his real feelings towards his wife, and are proper to be considered as proving the weakness of his will.

The facts developed by the proofs, when considered as a whole, are in sharp contrast with nearly every reported case. Our judicial literature is barren of precedents for the one I have now to decide. The cases in which wills have been set aside for undue influence are generally those of persons borne down with the infirmities of age or disease, and often were executed within a few hours of death. In some, by reason of apoplectic strokes, the testator had lost the power of vocal utterance and the ability to write, and had no power to express with certainty his testamentary wishes, even if his mind were capable of intelligent thought in respect to his estate and his kindred; and in some cases the wills were those of persons of weak mind bordering on imbecility. But in nearly all the wife was without means of her own, but possessed of engaging womanly qualities, and by the exercise of feminine arts, and sometimes by the aid of fraud and misrepresentation, secured her ends. But in this case the husband gives by his will to his wife a valuable estate to the exclusion of his children, and the wife without children, executed a will, bearing even date, giving the husband, in the event of her death, a much larger estate. Both wills were properly executed and at a time when the husband, only a few years the senior of his wife, was in middle age, and in robust health and of undoubted testamentary capacity. But his will so manifestly violates the ob-

ligations resulting from ties of blood, that I have taken pains to read and re-read the able briefs of the respective counsel, and have verified their statements by a perusal of the record of proofs, and I have made a more thorough search into the authorities than I have found it necessary to do in any preceding cases, to find, if I could, an application of the principles of law to the state of facts presented which would justify me, in the interest of moral right, in denying probate to the instrument.

The rule in respect to undue influence is clearly stated by Sir J. P. Wilde: "To make a good will, a man must be a free agent. But all influences are not unlawful. Persuasion, appeals to the affections or ties of kindred, to a sentiment of gratitude for past services or pity for future destitution or the like— these are all legitimate, and may be fairly pressed on a testator. On the other hand, pressure of whatever character, whether acting on the fears or the hopes, if so exerted as to overpower the volition without convincing the judgment, is a species of restraint under which no valid will can be made. Importunity or threats, such as the testator has not the courage to resist, moral command asserted and yielded to for the sake of peace and quiet, or of escaping from distress of mind or social discomfort, these, if carried to a degree in which the free play of the testator's judgment, discretion or wish is overborne, will constitute undue influence, though no force is either used or threatened. In a word, a testator may be led, but not driven; and his will must be the offspring of his own

volition and not the record of another." Hall v. Hall, 37 *Law J. Prob.* 40.

" What constitutes undue influence can never be precisely defined; it must necessarily depend in each case upon the means of coercion or influence possessed by one party over the other; upon the power, authority or control of the one, the age, sex, the temper and the mental and physical condition and the dependence of the other. Whatever destroys the free agency of the testator constitutes undue influence. Whether that object be effected by physical force or mental coercion, by threats which occasion fear, or by importunity which the testator is too weak to resist, or which extorts compliance in the hope of peace, is immaterial." Moore v. Blauvelt, 2 *McCarter Eq., N. J.* 365.

" There must be a control exercised over the mind of the testator, or an importunity practiced which he could not resist or to which he yielded for the sake of peace." Trumbull v. Gibbons, 2 *Zab., N. J.* 136.

" The influence must be such, as in some degree or in some extent to deprive the party affected thereby of his free agency, and to make the will not the product of his own untrammeled thought. 1 Jarman on Wills, 132.

" No matter how little the influence is, if the free agency is destroyed, it vitiates the act which is the result of it." Rollwagen v. Rollwagen, 63 *N. Y.* 519; Turner v. Cheesman, 2 *McCarter N. J.* 265.

" The undue influence is not often the subject of direct proof. It can be shown by the facts and circumstances surrounding the testator, the nature of the

will, his family relations, the condition of his health and mind, his dependency upon and subjection to the control of the person supposed to have wielded the influence, the opportunity and disposition of the person to wield it, and the acts and declarations of such person." Rollwagen v. Rollwagen, *supra.*

" Perhaps the most probable instance of such a dominion being acquired is that of an artful woman "
. . . . . " having taken possession of a man and subdued him to her purpose." Mountain v. Bennett, 1 *Cox* 355.

" If a wife by falsehood raises prejudice in the mind of her husband against those who would be the natural objects of his bounty, and, by contrivance, keeps him from intercourse with his relatives, to the end that these impressions which she knows had thus been formed to their disadvantage may never be removed, such contrivance may render invalid any will executed under false impressions thus kept alive." Boyse v. Rossborough, 1 *H. of L.* 2.

" If the court sees that any arts or stratagems, or any undue means have been used ; if it sees the least speck of imposition at the bottom—if there be the least scintilla of fraud—the court will, and it ought to, interpose." Huguenin v. Basely, 14 *Ves. Jr.* 289.

" Where the will is unreasonable in its provisions and inconsistent with the duties of the testator with reference to his property and family, or what civilians denominate an inofficious testament, this of itself will impose upon those claiming under the instrument the necessity of giving some reasonable explanation of

the unnatural character of the will." 1 Redfield on Wills, 516.

" Apparent unequality or unreasonableness in a testamentary disposition is entitled, in proportion to its degree of flagrancy, to some auxiliary influence, and unexplained, combined with other corroborative evidence, it may be entitled to great influence." Kevil v. Kevil, 2 *Bush.* 614.

" Such an unnatural exclusion from a just and equal share of his estate is a strong circumstance to show either incapacity or undue influence." Reynolds v. Root, 62 *Barb.* 250.

" For such gross inequality, no reason is suggested in the document itself or by the proof on trial. The testator had an unquestionable power to make such a will, but its apparent unreasonableness requires satisfactory evidence that it was the free, deliberate offspring of a rational, self-poised and clearly disposing mind." . . . . " Whilst therefore, the testamentary right should be carefully guarded and faithfully vindicated, the court should be vigilant to prevent, so far as it can, the abuse of that right, by withholding its approving seal from a document so unnatural and so questionable as to freedom and capacity as that now under its final consideration." Harrell v. Harrell, 1 *Duval* 203.

" When the party to be benefited by the will has a controlling agency in procuring its formal execution, it is universally regarded as a very suspicious circumstance, and one requiring the fullest explanation." 1 Redfield on Wills, 515; Marx v. McGlynn, 88 *N. Y.* 358.

" Direct evidence of her control in these matters, of her actual exercise of undue influence in procuring her will to be executed by him, could hardly be expected. . The means of keeping the influence out of sight were too many and of too easy application. But when such is the array of circumstances, when such a result is attained without any more substantial apparent cause, we are justified in saying from the evidence that the only cause to be inferred which is in the least degree adequate to produce the result is a long continued, persistent, overpowering influence to which his condition rendered him peculiarly subject, and which she was as peculiarly in a position to exercise." Delafield v. Parish, 25 *N. Y.* 95.

" Undue influence must be the influence exercised in relation to the will. It is not an influence in relation to other matters or transactions. But this principle must not be carried too far. When a jury sees that, at or near the time when the will sought to be impeached was executed, the alleged testator was in other important transactions under the influence of the persons benefited by the will, that as to them he was not a free agent, but was acting under control, the circumstances may be such as to fairly warrant the conclusion, even in the absence of evidence bearing directly on the execution of the will, that in regard to that also the same undue influence was exercised." Boyse v. Rossborough, *supra.*

" A party who offers an instrument for probate as a will must show satisfactorily that it is the will of the alleged testator, and upon this question he has the burden of proof. If he fails to satisfy the court that

the instrument speaks the language and will of the testator, probate must be refused." . . . . "It is not the duty of the court to strain after probate, nor in any case to grant it when grave doubts remain wholly unremoved and great difficulties oppose themselves to so doing." Delafield v. Parish, *supra*.

I have here cited the authorities most favorable to the contestants; but, as stated in Cudney v. Cudney, 68 *N. Y.* 152, "To invalidate a will on the ground of undue influence there must be affirmative evidence of the facts from which such influence is to be inferred. It is not sufficient to show that a party benefited by a will had the motive and opportunity to exert such influence. There must be evidence that he did exert it and so control the actions of the testator, either by importunities which he could not resist or by deception, fraud or other improper means, that the instrument is not really the will of the testator."

The exercise of undue influence is not a question of the age, the infirmities or the physical weakness of a testator, but of his strength of mind to resist the will of others. In determining the issue in a given case, the motive and opportunities for, and the means used for the exertion of the influence, the ability of the suspected party to assert and maintain his supremacy in his effort to stifle the impulses of natural affection or the desire to care for others in dispensing his bounty, are matters for consideration. In this case the decedent, though of middle age, in good health and of sound mind, was as submissive to the domination of his wife, as though he were enfeebled by age, or were an invalid in the sight of death, and

she, under such circumstances, had used the delicate arts of a refined womanhood to accomplish her sinister ends. The mental weakness of the decedent was that which was the result of a passive nature without the power of self-assertion against her overruling, positive mind. A strong case is made by the contestants, and but for the important fact completely established, which to my mind is decisive in respect to the validity of the will, it would be rejected. It is probable that the scheme of reciprocal wills was the suggestion of the wife under the belief that she, being eight years his junior, would outlive him. The proofs show that it was she who dictated the gift to each of his children of the trifling pittance of $100 out of his estate. But if she was sordid and grasping, he was mean, as evidenced by his allowing his first wife to support his children from the time of their separation until his death. When the will was made he knew that his second wife had abundant means which he would take if her death preceded his, and he also knew that he had but a trifling present estate, and that what he gave was only an estate in expectancy. in value not more than one half of that of his wife. It was five years before the life tenancy of his mother was terminated, and he came into possession of the property left him as remainderman under his father's will. At any time previous to his mother's death, had he died, his wife would have taken only the small estate, if any, which he had. Had she died the day after the wills were made he would have taken an estate which, at her death, is shown to have been worth $50,000. If the scheme of reciprocal wills was

concocted by the wife, I am convinced that he acquiesced in it intelligently, and understandingly, and voluntarily, under the selfish belief that it would be greatly to his advantage, if he outlived her. He was willing to take his chances. With her increasing habits of dissipation he might well believe that he would outlive her, and as his death only preceded hers by four months, if such was his belief, his calculation was not far from right. But he lived in fair health six years after the date of the instrument and never disavowed its provisions. At any time he could have formally revoked it, or could have made another by which his children, to whom he owed a parental duty, would have been provided for. That his thoughts had been turned to the subject is shown by the testimony of Mr. White, the draftsman of the instrument under consideration, to whom he stated that he wished to see him to make a new will. He neglected his opportunity or abandoned his purpose, and, as a consequence, one son is coldly shut off with a pittance, and the other, a helpless imbecile, is cruelly denied the sustenance to which the law of nature entitles him. His father's treatment of him was brutal. But, under the law, the injustice of a competent testator toward the natural objects of his loving kindness and bounty cannot affect the validity of his will, and I am compelled to hold that the contestants have failed to sustain their allegation of undue influence.

A decree of probate may be presented.