1. WILLS—EXECUTION—CONFLICT IN TESTIMONY OF SUBSCRIBING WITNESSES.
   The testimony of one of the subscribing witnesses to a will as to the fact of its execution and publication by testatrix, which is supported by the attestation clause, containing, in addition to the usual words, a recital that testatrix acknowledged her signature at the time she made it, is sufficient to admit the will to probate, though the other subscribing witness testifies that she did not hear testatrix acknowledge her signature, and that she did not see testatrix sign the will.

2. SAME—SIGNATURE IN PRESENCE OF SUBSCRIBING WITNESSES.
   The presence of the subscribing witnesses to a will in the same room with testatrix at the time she signed, and in positions where they can actually see testatrix write if they choose to do so, is a sufficient compliance with 2 Rev. St. N. Y. marg. p. 63, § 40, subd. 2, which requires a will to be executed in the presence of each of the subscribing witnesses; and the fact that one of them refrained from looking at testatrix while she was signing, for fear that it would make her nervous, will not invalidate the will.

3. SAME—UNDUE INFLUENCE.
   Testatrix and one of her daughters lived together, and both were invalids. Each made wills, giving a life-estate in her property to the other in case of survivorship. By testatrix's will, the remainder of her estate was given to her grandsons, to the exclusion of another daughter, with whose conduct testatrix had repeatedly declared herself dissatisfied. Testatrix survived the invalid daughter about three months, but made no change in her will. *Held*, that testatrix's declaration, made before the execution of her will, that there was no peace for her unless she did as the invalid daughter wanted her to, was insufficient to establish undue influence on the part of such daughter.

Application for the probate of the will of Ann Bedell, deceased.
*J. I. Werner*, for proponents.  *N. A. Calkins*, for contestant.

SANDERSON, S.  The probate of the will of Ann Bedell is resisted on the ground that it was not duly executed according to the provisions of the Revised Statutes, and also for the reason that Mrs. Ladoux, daughter of the testatrix, exercised undue influence over her mother in the making of the will. The testimony of the two witnesses to the will is widely apart as to what took place at the time of the execution of the will.  Edwin C. Hallenbeck, a counselor at law, residing at Coxsackie, drew the will and also became a witness to it.  Mr. Hallenbeck testifies that he read the will to the decedent, who expressed herself satisfied with it.  She also requested him to witness its execution, and then, at the request of Mrs. Bedell or Mrs. Ladoux, he went out and called in Louisa M. Raymond, a neighbor, as the other witness.  Nothing further was done until she came.  There were present in the room at the time of the execution of the will, the decedent, her daughter Mrs. Ladoux, and the two witnesses.  Mrs. Ladoux sat at one end of the table, the witness, Mrs. Raymond, sat at the other end, testatrix sat in front of the table, and Mr. Hallenbeck stood between Mrs. Raymond and Mrs. Bedell.  Mrs. Bedell demurred about writing her name, saying she had not done much writing lately.  Mr. Hallenbeck told her it would be better for her to write her own name.  She then took the pen and he told her where to write.  The testatrix said she did not want them to watch her, as she was nervous.  She then wrote her name.  After writing her name the testatrix said her signature was not very good.  There was then some conversation between Mr. Hallenbeck and Mrs. Raymond to the effect that the signature was very good for a person of her age.  Witness Hallenbeck then took up the will, and, using the attestation clause as a guide, asked the questions, in regular order, if she acknowledged the same and declared it to be her last will and testament.  Witness says Mrs. Bedell looked quizzically at him.  Mrs. Ladoux said: "Why don't you answer the question."  Then Mrs. Bedell said: "What did I have the will drawn and you here for?"  Hallenbeck told her it was the formal proof. She then said it was.  Hallenbeck then asked her if she wished Mrs. Ray--

mond and himself to sign as witnesses thereto, and she answered in the affirmative, or gave her consent.  It appears that the testatrix did not audibly respond.  The witnesses then signed the will immediately below the attestation clause.  Mrs. Bedell then asked Hallenbeck what she should do with the old will, and he told her the new will revoked the old, and she could destroy it or do what she pleased with it.  The will itself is a short one, covering, with the attestation clause, less than two pages of legal cap.  The signature of Ann Bedell opposite a seal is in large size writing, just above the attestation clause, and on the same page with that of the witnesses.  The attestation clause is very full, containing, in addition to the usual words, the following statement: "She, at the time of making such subscription, acknowledged that she made the same."  And this is the question Mr. Hallenbeck says he put to Mrs. Bedell, as well as the other one declaring it to be her last will and testament.  In form both questions were put in one, and the answer made by her was "Yes," or "It was."  While the testatrix was subscribing her name to the will, Mrs. Raymond was talking to Mrs. Ladoux and Mr. Hallenbeck, but Mr. Hallenbeck says he watched her making the motions in writing her name.  He does not know whether Mrs. Raymond did the same or not.  It it difficult to know how the formal execution of a will can be more perfectly made than this was.  Mr. Hallenbeck also made the usual proof of this will, that testatrix was of sound mind and not under restraint.  The other witness to the will, Mrs. Raymond, says she signed her name as a witness to the will, but did not hear the testatrix declare it to be her will; that Mrs. Bedell did not ask her to sign it, but Mrs. Ladoux did.  She says she did not see Mrs. Bedell's signature to the will, nor did she see her write her name to it.  She heard Mr. Hallenbeck ask if she acknowledged that instrument to be her last will and testament, to which Mrs. Ladoux answered: "That is all."  Mrs. Bedell answered nothing.  Mrs. Raymond says she supposed it was Mrs. Ladoux's will she was witnessing.  She says that after Hallenbeck read something, which she does not remember, she signed her name; that Hallenbeck read the instrument over, and she signed what Hallenbeck read aloud.  Afterwards this witness says Hallenbeck did not read a word; that she does not remember whether Hallenbeck read from the paper or not, or from the attesting clause, or whether he took up the will and asked the questions from it.  It is evident that this witness was confused and forgetful, or very inattentive to what did occur.  She does not seem to remember any of the conversation that took place between Hallenbeck and the testatrix.  She admits nothing was said about its being Mrs. Ladoux's will.  She does not know whether Mrs. Bedell was of sound mind, and thinks she was under restraint, and yet nothing was said or done while she was there that led her to believe that testatrix was under restraint.  The will lay on the table when she went in.

The testamentary capacity of the testatrix is satisfactorily made out.  Dr. Merriam, the only medical expert examined, was called by the contestant.  He says that she was in the possession of her senses and faculties.  Abram M. Hallenbeck, a witness on behalf of proponents, transacted considerable business with her or for her, both before and after the execution of the will.  He never saw anything but what she was perfectly rational and capable of understanding her own affairs.  Her recognition of friends and of her family relations was full, and never ceased.  Several of the witnesses state that she was forgetful, and would repeat a story several times during a conversation.  But Mr. Abram Hallenbeck, whose opportunity to observe her mental condition was as good as any one, says he never noticed any loss of memory, or of ability to comprehend what was said.  About four years before her death she had suffered from a partial paralysis of the muscles of the tongue.  After this she conversed much less, and spoke slower. `From nervous prostration, or other causes, she had but partial use of her limbs.  She got around with the use of a cane or crutch, or by chairs.  The testatrix was about 80

years of age at the time of the execution of the will. It is clearly within the line of the authorities that physical disabilities, and even a considerable degree of mental impairment, are consistent with capacity to make a will, and no stress was placed by counsel for contestants in his brief or argument upon a defense from this source alone. *In re Soule,* 3 N. Y. Supp. 259.

The fact that the two witnesses disagree as to material facts in the execution of the will is not sufficient of itself to defeat the probate of the instrument. Neither the forgetfulness nor perversity of one of the witnesses should prevent the passage of property in the direction indicated by the decedent, if it can be ascertained from any source that the formalities required by the statute have been complied with. A will may be admitted to probate upon the testimony of one of the witnesses to the will in opposition to the testimony of the other, or even in opposition to the testimony of both. *Trustees* v. *Calhoun,* 25 N. Y. 422; *Tarrant* v. *Ware,* Id. 425, note; *In re Stillman,* 9 N. Y. Supp. 446; *Peck* v. *Cary,* 27 N. Y. 9; *In re Cottrell,* 95 N. Y. 329. The testimony of Edwin C. Hallenbeck, one of the witnesses to the will, is full and satisfactory as to what transpired at the time of the execution of the will. No one can doubt that he is giving the facts as they actually occurred. With his testimony agrees the attestation clause in the will, the will itself, the signature of the testatrix, and all the facts that surround the case.

The only question that can arise upon his testimony is whether the subscription by the testatrix was made in the presence of each of the witnesses. 2 Rev. St. marg. p. 63, § 40, subd. 2. Mr. Hallenbeck testifies that while Mrs. Bedell was signing her name to the will Mrs. Raymond sat a little ways from the table in conversation with Mrs. Ladoux and himself. This was done apparently for the reason that Mrs. Ladoux or her mother had requested the two witnesses not to look at Mrs. Bedell, as it made her nervous. Notwithstanding the conversation that was going on, Mr. Hallenbeck says that he actually watched Mrs. Bedell make the motions of signing her name, but he cannot say whether Mrs. Raymond watched her or not. It seems by the testimony of Mr. Hallenbeck that he told Mrs. Raymond before he came to the house that Mrs. Bedell wanted her as a witness to her will, and that she came right over. Mrs. Raymond also says she knew she went to Mrs. Bedell's to witness a will. The witnesses and the testatrix were all in the same room, sitting or standing at a table in close proximity to each other. The will was lying spread out on the table. Then ensued the conversation between Mr. Hallenbeck and Mrs. Bedell in relation to her signing the will, and the difficulty she had in writing, and then the request that the witnesses would not watch testatrix. Pen and ink were upon the table. The testatrix then subscribed her name to the will in the manner required by statute. Whether or not Mrs. Raymond actually saw the motions of the pen while Mrs. Bedell was writing her name, it is sufficient if her subscription was made in the presence of each of the witnesses. They were all together for the purpose of witnessing the execution of the will, and where they could actually see testatrix write if they had chosen to do so. The *factum* covers the language of the statute, and is within the language of the authorities. In England, where the statute requires that the witnesses shall subscribe the will in the presence of the testator, these words have often been the subject of judicial examination. The rule there is stated to be: "It is enough if the testator might see." "It is not necessary he should actually see them signing, for at that rate if a man shall turn his back, or look off, it would vitiate the will." Lord ELLENBOROUGH lays down the rule that it is "not necessary that the devisor should actually see. In favor of attestation it is presumed if he might see, he did see." 1 Redf. Wills, marg. p. 245, 247, 248. In *Spaulding* v. *Gibbons,* 5 Redf. Sur. 316, 319, the surrogate says: "He does not say that he was not present, but only that he did not see the testator sign. If he was in the same room with him, or in the adjoining room, in such a position that

he could see him sign after his attention had been drawn to what was going on, the signing will be considered to have taken place in his presence, particularly as on further examination he says that he does not remember whether or not he saw the testator sign the will." In *Gardiner* v. *Raines*, 3 Dem. Sur. 98, several cases are cited bearing upon this subject, leaving no doubt that the law in this state is the same as it is in England. *Peck* v. *Cary*, 27 N. Y. 9, 31. The signature of the decedent is plainly visible upon the will; it is on the same page with the signatures of the witnesses, with the attestation clause and a blank line or two intervening between them. The will was spread out upon the table, was signed by the testatrix in the manner above indicated, was declared by her to be her last will and testament, and Hallenbeck and Raymond were requested by the testatrix to sign it as witnesses. Such, at least, is the testimony of one of the witnesses, and some of the facts are conceded by the other witness. We think, also, that these facts are sufficient proof of the due execution of the will. In *Re Higgins*, 94 N. Y. 554, 557, the court says: "Aside from what has been already remarked, we think that the testimony of Jones, who swore positively that the testator acknowledged the will to be his last will and testament, was an acknowledgment of his signature and sufficient with the other evidence given by him to establish a due execution of the will. The signature was plainly visible upon the instrument itself, and the testator having requested Jones and Stoker to subscribe their names to it as witnesses, and he having acknowledged the same to be his last will and testament, the statute was fully complied with in this respect within the decisions of this court." In *Re Phillips*, 98 N. Y. 267, 273, the court says: "The exhibition of the will and of the testator's signature attached thereto, and his declaration to the witness to attest the same, were, we think, a sufficient acknowledgment of the signature and publication of the will." Such also is the law of England upon this subject. *Baskin* v. *Baskin*, 36 N. Y. 416; *Willis* v. *Mott*, Id. 486; Dayton's Surrogate, (3d Ed.) p. 77, note. The testimony of Hallenbeck goes further than this. He says that after decedent subscribed her name to the will he asked her if she made the same. This is separate and apart from the question whether she declared it to be her last will and testament. Her answer to both questions is in one, "Yes." With this also agrees the attestation clause, which states that "she, at the time of making such subscription, acknowledged that she made the same." Mr. Hallenbeck also states that he framed his questions from the attestation clause, holding the instrument in his hands. In a conflict of evidence the attestation clause becomes valuable. It cannot be doubted that the evidence of Hallenbeck, skilled and qualified for the performance of his duties, is much more valuable than the testimony of a witness like Mrs. Raymond, who, by her own testimony, was careless and negligent in the performance of what she was called upon to do. The testimony leaves no doubt in my mind that the will was duly executed according to the laws of this state.

The question of undue influence remains to be considered. The charge is that Mrs. Ladoux, daughter of the decedent, exercised this influence over the mother, which overpowered the will of the latter, and caused her to execute a will which does not embody her wishes and judgment. The object of Mrs. Ladoux, it is claimed, was to have her mother make a will that should be more favorable to herself. Both Mrs. Bedell and Mrs. Ladoux were confirmed invalids before the will in question had been made. Mrs. Ladoux was unable to walk, and was wheeled about in a chair. Each of them was possessed of moderate means, the exact amount of which does not appear. Mrs. Bedell had four children; one of them died, leaving three boys, known as the Cook boys, and they are made the residuary legatees in the will. There is also one son, Edwin Bedell, who moved west more than 20 years ago, and, so far as the evidence discloses, he has never returned home since he left. Lydia Jane Flansburgh, the contestant, is another daughter. She moved west about

the same time her brother did, and with the exception of a visit made in the fall of 1885, which continued for nearly a year, she did not return home after she left for the west until about three months before her mother's death. Mrs. Ladoux, the remaining daughter, had lived with her mother a great many years, and they apparently had never lived apart from each other. Both Mrs. Bedell and Mrs. Ladoux had made wills some time before the will in controversy. It seems to have been understood between them that their wills should be so drawn that whichever one died first the survivor should have the use of the decedent's estate as long as she lived. Mrs. Ladoux made the Cook boys residuary legatees in her will. Mrs. Bedell, in her first will, made her daughter Mrs. Flansburgh a legatee, to what extent does not appear. In the second or last will the Cook boys are sole residuary legatees, and the two wills are said to be reciprocal of each other. Mrs. Bedell's first will is not put in evidence, but from the evidence it would appear that the only difference between the first will and the second is in the residuary clause. Mrs. Flansburgh receives nothing, neither does her brother Edwin. The evidence discloses no change in the second will from the first, except in leaving out the name of Mrs. Flansburgh. The provision for Mrs. Ladoux apparently remains the same. Such provision as mother and daughter made for each other in this case seems to be just and proper. If these facts are so, it is difficult to see what interested motive Mrs. Ladoux could have had in urging her mother to make a will which would be really not her own. Some time in the fall of 1885 Mrs. Bedell had a slight stroke of paralysis which affected the organs of speech so as to make it difficult for her to talk, or at least she was much slower of speech than before. She had also been lame, the result probably of age, which was increased after this new affliction. It was about this time that Mrs. Flansburgh returned home. She remained about 10 months before going back, but she occupied a portion of the time in visiting neighbors and friends. It appears that her mother was not satisfied with the conduct of Mrs. Flansburgh while making this visit. She says that Mrs. Flansburgh did not treat her as a daughter should. She complained of her conduct from, at, and before the time of the execution of her will until near her death, in November, 1889. The difficulty seems to have been that Mrs. Flansburgh wanted pay, or more pay, for taking care of her mother and doing housework than her mother was willing to give her. This conduct of her daughter led Mrs. Bedell to send for Mr. Hallenbeck to draw a new will. This was in the spring of 1886. When Mr. Hallenbeck came to the house Mrs. Bedell told him how she wanted her will drawn, of which Mr. Hallenbeck made a memorandum. There was considerable talk between Mr. Hallenbeck, Mrs. Bedell, and Mrs. Ladoux in regard to the legal effect of not mentioning Mrs. Flansburgh in the will, and also in regard to the reciprocal nature of both of their wills. It is undoubtedly true that they canvassed together what disposition should eventually be made of their property, and each understood how the other's will was drawn, or was to be drawn. The only difference there ever was between their views was in regard to the residuary legatees. In *Re De Baun's Estate*, before the surrogate of New York, and reported in 9 N. Y. Supp. 807, it was held that although the will was the result of undue influence on the part of the wife, yet as the wills of each of them were reciprocally for the benefit of each other, and in that respect made in the free exercise of their own judgment, the will should be admitted to probate. The case in hand is without direct proof of any undue influence, or of what the law regards as suspicious circumstances. The change made in her will by Mrs. Bedell is sufficiently accounted for by a change in her own feelings towards Mrs. Flansburgh, and this feeling of undutiful conduct continued to a very late period in her life. It is not for the surrogate to say whether the grounds for this change were reasonable or not. There is no proof whatever that Mrs. Ladoux brought about this change. She agreed with her mother in regard to the

matter. There are not the usual *indicia* of fraud or imposition which accompany undue influence. The will was made during the period that Mrs. Flansburgh was on her visit at Coxsackie. She was probably not at her mother's at that time. No effort whatever was made to keep her away from her mother. On the contrary the trouble between her and her mother was occasioned by her unwillingness to stay and take care of her mother and of her house, except on terms that her mother was not willing to submit to. Mrs. Flansburgh occupied very much of her time while at Coxsackie in visiting friends and relatives. Perhaps the strongest item of evidence upon the subject of undue influence is the testimony of witness Abigail Powell, that on repeated occasions "for two or three years back" she had heard Mrs. Bedell say "she would have to do as she [Mrs. Ladoux] wanted her to do, or else I won't have any peace." It does not appear that Mrs. Bedell had any reference to the .execution of the will by her, nor is there anything to show what led up to this remark. It is a sufficient answer to this evidence to say it has no weight in proving the fact of undue influence. There are no facts proved to show that Mrs. Ladoux exercised undue influence. The authorities upon this subject are conclusive that such evidence standing alone is inadmissible and hearsay. *Waterman* v. *Whitney*, 11 N. Y. 157; *Cudney* v. *Cudney*, 68 N. Y. 148; *Marx* v. *McGlynn*, 88 N. Y. 357.

Some importance is attached to the 'fact that Mrs. Ladoux, a short time before her death, asked a neighbor to answer a letter she had received from Mrs. Flansburgh. Mrs. Ladoux told her to write "that she must not wait for me to write for I am too feeble." Mrs. Bedell said why not send for her at once, to which remark Mrs. Ladoux replied that it was not necessary. I attach no importance to this conversation whatever. It was notice to Mrs. Flansburgh of the feeble condition of her sister, but did not request her to go to the expense of leaving home on that account, unless she chose voluntarily to do so. It could not have been made for the purpose of keeping Mrs. Flansburgh away from Coxsackie, for the reason that about the same time Mrs. Ladoux told another witness that Mrs. Flansburgh ought to have stayed and taken care of them while they were sick; if she had done so she would have had a good house, now she would have none. Mrs. Ladoux knew about the will and the circumstances of making it, and therefore she spoke truly. Mrs. Bedell and Mrs. Ladoux lived together happily and pleasant all their days. Their business transactions, so far as the evidence discloses, were an open book to each other. Mrs. Bedell survived her daughter about three months, and lived more than three years and a half after the execution of her will. During all this time she remained in possession of her faculties; at least no change in this respect was shown. And yet no change was made in her will, nor did she ever express any desire to make a new will. On the contrary, a short time before her death, and when the pressure of the influence of Mrs. Ladoux, whatever it may have been, had been removed by her decease, she remarked, in answer to a question put by a witness for the contestant, if she had any orders to 'leave, that she had none, everything was on paper; a re-acknowledgment in fact, if not in law, of the provisions of her will. An examination of the evidence shows that the will of Mrs. Bedell follows very closely the lines of her affections. Of her son Edwin, she said: "I don't think he will come down to see me, but if he thought there were one or two thousand dollars after my death, then he would;" and to Edwin she left nothing. Mrs. Flansburgh was the undutiful daughter, a reiterated opinion, up to near the close of life; and she removed her name from the second will. It is not remarkable that two invalids, mother and daughter, living together in closest intimacy for many years, should seek to provide each for the other a suitable maintenance during the remainder of the life of the survivor. The provisions of their respective wills in this respect are humane and just. The remark of Mrs. Bedell that there was no peace for her unless she did as Mrs.

Ladoux wanted her to do, even if we give it greater weight than I believe it is entitled to, was scarcely a ripple upon the surface of their lives. They were contented in each other's society beyond all controversy. As to the Cook boys, who have now become the principal beneficiaries under both wills, the testimony of all the witnesses agree that they were favorites of their grandmother, and well deserving of her esteem. It is not for this court to say whether some other distribution of the property would not have been more equal and just; it is sufficient to say that there has been no violation of the law in the disposition that has been made of it in the will in question. An examination of a few of the decided cases will show that the conclusions that have been reached are within the lines of well-established precedents. In *Brick* v. *Brick*, 66 N. Y. 145, the will was made in 1855, leaving a large estate to the widow to the exclusion of brothers and sisters. A witness testified that in 1860 at a dinner, testator and his wife being present, testator said that Samuel was expecting to get something from his estate, and his wife said he would be mistaken; that if she could help it, he would not get anything; that she did not want the money wasted in the extravagant way that Samuel lived. The will had then been made, though his wife did not know it, as she testifies. The court says: "The expression by Mrs. Brick of her opinions and wishes in regard to the disposition to be made by the testator did not amount of itself to undue influence, so long as she did not use unfair or improper means to have her wishes carried out, and the testator was competent to form his own judgment, and act in accordance with it." A sister of the testator testified, without locating the time, that testator's wife told her that the testator should not leave Samuel anything if she could help it, and that she was not willing that the testator should do anything for her (witness.) This witness also testified to many facts for the purpose of showing that Mrs. Brick estranged the affections of the testator from her and her children, and caused her to be expelled from his house in 1855. That a serious difficulty then arose between the testator and his sister is certain. She attributed it to the influence of Mrs. Brick. Her allegations in this respect were controverted. By a will made in 1852 he had bequeathed to her $8,000, but after this quarrel he made the will of 1855, omitting any provision for her. The court says: "He had the right if he chose to exclude his brothers and sister from participation in his estate, and although a disregard of the claims of kindred is a circumstance to be considered in determining cases of this description, yet it is not controlling, nor is it necessary that the motives of the testator for so doing should be satisfactory to the court, provided we are satisfied that it was the real intention of the testator and not the result of moral coercion or deception practiced upon him." See also *Clapp* v. *Fullerton*, 34 N. Y. 191, where a daughter on slight grounds was excluded from the benefactions of her father's will. In *Horn* v. *Pullman*, 72 N. Y. 269, the will was in favor of a grandson and his wife to the almost entire exclusion of his own children. At the time of making his will the testator had become greatly enfeebled by reason of sickness both in mind and body. His sight and memory were greatly impaired, and for a year or two before his death he would repeat questions sometimes two or three times in the same conversation. The court says: "A testator has the right to dispose of his estate in any way he may deem best. He is not required to make an equitable will, and he may, if he chooses, exclude his children, or divide his estate among them unequally. The question in all such cases is, was the will the free act of a competent testator? The reasons for a change in this case do not very satisfactorily appear." One witness testified that in a conversation at her house the testator said that he had willed his property to his grandson for the reason "that Sarah Pullman, his son's wife, had hen-pecked him all the time until he was obliged to do what he did." So also statements made by his grandson's wife, one of the principal beneficiaries, strongly tending to show that every exertion had

been made on her part to secure the inheritance of the property, were excluded by the surrogate, and the court held them entirely insufficient to make out a case of undue influence. In the judgment of this court the will of Ann Bedell was executed in conformity to law, and is the free act and deed of a competent testatrix.